Filed 4/24/25  P. v. Kalso CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SAMANTHA JOSEPHINE KALSO,<br><br>Defendant and Appellant. | C099401<br><br>(Super. Ct. Nos. 23CF01483, 21CF05562, 22CF02233, 22CF02243, 23CF01771 & 23CF01774) |

Defendant Samantha Josephine Kalso was convicted, following a jury trial, of attempted burglary and burglary.  She argues on appeal that the trial court erred in discharging a juror during deliberations on grounds of bias and for failing to deliberate.  She also argues that she received ineffective assistance of counsel when her attorney failed to object to irrelevant and prejudicial testimony from the victim.  We agree that the trial court abused its discretion in discharging the juror and that this error requires reversal of the judgment.  Accordingly, we need not address defendant's ineffective assistance claim.

1

BACKGROUND FACTS AND PROCEDURE

*Prosecution's Case*

On March 22, 2023, at approximately 2:15 a.m., Brian T.[1] was in his home watching television when he received an alert through his cell phone that there was a motion at his back door. On video captured by a home surveillance camera, Brian T. observed a woman in a white "hoodie" and red shoes attempting to gain entry by turning the handle on his door. Another woman, dressed in a dark coat, was standing beside his neighbor's car. The woman by the car made a loud noise, which caused the woman at Brian T.'s door to turn and walk away, toward his neighbor's house.

Brian T. went outside to investigate. Shortly thereafter, Brian T. saw both women—the one in the white hoodie and the one in the dark coat—run out of his neighbor's house. Brian T. could see that the woman in the dark coat was carrying something as she ran.

Brian T. provided the video from his surveillance camera to local law enforcement. Kevin Haas, a detective with the Chico Police Department, watched the video and recognized defendant as one of the suspects. The detective later interviewed defendant, who admitted to being the person in the white hoodie in the video.

At defendant's trial, the prosecution played Brian T.'s home surveillance video for the jury. Brian T.'s elderly neighbor, F.A., watched the video and identified the woman in the white hoodie as a person she had seen inside her house. F.A. testified that she had been trying to sleep in her bedroom when one of her cats jumped on top of her. F.A. got up and saw the person in the white hoodie coming out of her home office, carrying some files. F.A. yelled and the person in the white hoodie ran out the back door with her files.

---

[1]      To protect their privacy, we refer to this individual by his first name and last initial, and the victim and other individuals by their initials. (Cal. Rules of Court, rule 8.90(b)(4), (10) & (11).)

F.A. later discovered that multiple items had been taken from her house, including her purse and car keys.

The next evening, F.A. heard a beeping noise in her carport. When she went outside to investigate, she saw someone in dark clothing trying to access her car. An altercation ensued, which ended with F.A. being taken to the hospital with a concussion.

*Defense Case*

Defendant testified on her own behalf. Defendant admitted she was the person in the white hoodie captured on the home surveillance video, but denied that she went to Brian T.'s house with the intent to steal anything and denied entering F.A.'s house. Defendant claimed that she went to Brian T.'s house because her sister's friend, K.O, said that a man staying with Brian T. had taken K.O's baby. Defendant, K.O, and K.O's boyfriend went to Brian T.'s house to get the baby. When they arrived, defendant tried to enter Brian T.'s house through the back door, but it was locked, so K.O told defendant to get her boyfriend, who was in the car. K.O's boyfriend then went to help K.O while defendant remained in the car. A short time later, when K.O and her boyfriend returned to the car, K.O's boyfriend was carrying a file with papers.

*Verdict and Sentencing*

After trial, a jury found defendant guilty of one count of attempted residential burglary (Pen. Code, § 664, subd. (a)/459; count 1)[2] and one count of residential burglary (§ 459; count 2). As to both counts, the jury found that a person was present in the residence at the time of the offense (§ 667.5, subd. (c)(21)). In a bifurcated bench trial, the court found five aggravating factors true.

In three companion cases, defendant pleaded no contest to (1) driving or taking a vehicle without consent (Veh. Code, § 10851, subd. (a); Butte County Sup. Ct. case No. 21CF05562; (2) failing to appear on her own recognizance (§ 1320, subd. (b); Butte

---

**2** Undesignated section references are to the Penal Code.

3

County Sup. Ct. case No. 22CF02233; and (3) felony theft of identifying information with a prior (§ 530.5, subd. (c)(2); Butte County Sup. Ct. case No. 22CF02243).

In February 2023, defendant was sentenced on these three cases. The trial court took judicial notice of its files in Butte County Superior Court case Nos. 16CF01621, 17CF00082, 18CF02144, and CM038457, and found aggravating factors to be true. The court sentenced defendant to an aggregate term of four years and four months in prison, but suspended the execution of the sentence and placed defendant on probation for two years.

In May 2023, two companion cases in which defendant was on mandatory supervision in Sutter County were transferred to Butte County and designated as Butte County Superior Court case Nos. 23CF01771 and 23CF01774.

In July 2023, the trial court found defendant in violation of probation or mandatory supervision in all five companion cases based upon the guilty verdicts in this matter (Butte County Sup. Ct. case No. 23CF01483).

On August 30, 2023, the trial court sentenced defendant to an aggregate term of 10 years in prison for the six pending cases. The sentence was calculated as follows: A six-year upper term for count 2 (burglary) in Butte County Superior Court case No. 23CF01483, plus a consecutive term of eight months (one-third of the midterm) for count 1 (attempted burglary) in Butte Superior Court County case No. 23CF01483, plus consecutive terms of eight months (one-third of the midterm) each for Butte County Superior Court case Nos. 21CF05562, 22CF02233, 22CF02243, 23CF01771, and 23CF01774.

Defendant filed a timely notice of appeal of the court's judgment.

4

DISCUSSION

I

*Discharge of Juror No. 12*

Defendant contends that the trial court abused its discretion and violated her Sixth Amendment right to a fair and impartial jury by discharging a "holdout" juror during deliberations.

A.      *Additional Background*

During jury selection, the trial court questioned prospective jurors based on their responses to a written jury questionnaire, which included the question: "Do you have any family members or close friends that are in law enforcement?" When the court questioned Juror No. 12 (Juror 12), he revealed that his in-laws were in law enforcement. He said his mother-in-law was a retired officer and his father-in-law was still in law enforcement. The court asked Juror 12 if he had any concern that his in-laws' connection to law enforcement would bias him one way or another. Juror 12 said, "No," he could be fair. Juror 12 was empaneled.

Jury deliberations in defendant's trial began in the afternoon on Friday, June 30, 2023. That same day, the jury sent a note requesting a read-back of testimony from defendant, Brian T., and F.A. Around 4:30 p.m., without having reached a verdict, the jury adjourned for the weekend.

On the second day of deliberations, the jury sent the trial court a note expressing concerns about the conduct of Juror 12. The note, signed by Juror No. 11 (Juror 11), stated: "[There's a] [c]oncern that [Juror 12] is unable or unwilling to consider only the evidence presented and follow the rules of the court. [Juror 12] has stated that several of the other jurors believe that everyone in jail is guilty. [Juror 12] brought his own notes into the jury room."

Outside the presence of the other jurors, but with counsel present, the trial court questioned Juror 11 about the note. The court first asked Juror 11 to elaborate on the

5

concern that Juror 12 was unable or unwilling to consider the evidence and follow the court's instructions. Juror 11 said that deliberations were "very difficult" because Juror 12 repeatedly interrupted the other jurors, questioned what specific words meant, and speculated about the evidence.

Juror 11 also complained that Juror 12 had "almost refused" in some instances to "either take parts in votes or participate in our deliberations so that we can reach a verdict." Asked to elaborate, Juror 11 explained that after the jury agreed to take a vote on the first day of deliberations, Juror 12 initially remained silent, finally answering only after Juror 11 told him that he could not remain silent. Juror 12 then refused to vote on the second count because he felt the jurors were "pressuring him." When asked if Juror 12 was willing to sit and listen to the other jurors' perspectives, Juror 11 answered: "With several interruptions." Juror 11 conveyed that other jurors shared the same concerns about Juror 12 not considering the evidence.

The trial court then asked about Juror 12 accusing other jurors of believing that "everyone in jail is guilty." Juror 11 heard Juror 12 make the accusation but denied its truth; Juror 11 did not hear any of the other jurors express a belief that everyone in jail is guilty.

Turning to the concern that Juror 12 brought his own notes into the jury room, the trial court asked Juror 11 for clarification. Juror 11 replied that on the second day of deliberations, Juror 12 had a "small notebook" that "he took out of his bag." Juror 12 said he "had been taking other notes." Juror 11 saw Juror 12 reading from the notebook during deliberations.

The trial court permitted counsel to question the juror. The prosecutor asked Juror 11 if Juror 12 had stopped deliberating. Juror 11 replied, "The only way that I can describe it is splitting hairs on almost every word of testimony and evidence." Juror 11 went on to explain that it was "very difficult to have discussions and deliberate with the constant interruptions, the constant questioning of what specific words may mean."

6

"We've attempted to engage him in discussing what his concerns are so that we can all discuss them. And he seems to be becoming more unwilling to do that." The prosecutor asked, "Do you believe [Juror 12 is] able to perform the duties of a juror, following the law and the guidelines that the judge gave you?" Juror 11 responded, "No, I do not."

When questioned by defense counsel, Juror 11 said, "When anyone was speaking about any evidence or testimony, [Juror 12] would interrupt them and bring in other speculation that was not in evidence." For example, Juror 12 questioned F.A.'s credibility because of her age and because she might have been motivated to "seek revenge" for the concussion she suffered. Likewise, "because some timelines did not completely add up [as to] when the police were called," Juror 12 asserted, "it rose to the level of reasonable doubt." Juror 11 explained that other jurors attempted to respond to Juror 12's concerns, but "[h]e continued to interrupt others," and "would laugh, throw his hands up, and say, 'Well, we could just have a hung jury then.' " Juror 12 reportedly said that it did not matter if deliberations continued because he "would not [re]consider his vote."

After hearing from Juror 11, the trial court questioned Juror 12. Juror 12 told the court that he was participating in deliberations and would continue to do so. Juror 12 admitted that he expressed concerns that several other jurors were biased against people who had been arrested or in jail. He criticized those jurors because they seemed to make up their minds before deliberations even started, and he felt that was unfair. He said he felt "forced" during the initial voting because he did not feel the jury had engaged in any meaningful deliberations. He felt like deliberations did not begin in earnest until after the initial vote.

Juror 12 admitted that he brought a personal notebook on the second day of deliberations, but denied it contained any outside information about the case. He claimed that he only used the notebook to help him politely and clearly share his thoughts with the

7

other jurors because he felt he was not being "heard" and was being pressured to change his vote.

Juror 12 denied any bias against F.A. because of her age. He said his opinion of F.A. was based on the evidence presented.

At one point, Juror 12 volunteered that he "forg[o]t to mention" during jury selection that his father had been a correctional officer. He stated he did not bring it up earlier because "[i]t's just not how I see my father," who "died when [Juror 12] was 18." The trial court asked Juror 12 if his father's occupation raised any concern that he would be biased one way or another towards law enforcement. Juror 12 said he "[didn't] think so," adding that he viewed his father as a "peace officer." He said his father was a "very respectful officer."

The prosecutor followed up by asking Juror 12 why he described his father as a peace officer, rather than a correctional officer. Juror 12 responded: "Because officers often aren't respectful. At least—perhaps, that's my bias. But I find that a lot of officers use a lot of disrespectful ways of conducting their conduct. And my father was not of that kind. He was a peace officer trying to keep the peace." He apologized "if that was a bias." The following exchange then took place:

"[Prosecutor]: So you just told us you have a bias against police officers.

"[Juror 12]: I suppose that's how it sounded. . . . I don't see it as a bias when I can look at people and look at the evidence. But I find it definitely to be not as much of a bias as the rest of my peers. But, yeah, take it how you want."

The prosecution asked Juror 12 about his comment that it did not matter if the jury continued to deliberate. Juror 12 said those were not his words, but "the vibe" of the jury room was that "not much more [was] going to be discussed without bias . . . from [his] peers."

Defense counsel asked Juror 12 if the jury was giving him a chance to express his views and if he was listening to their views. Juror 12 said, "Yes. Very much so." Juror

8

12 admitted that he did not participate in one vote, but that was because he "felt forced into [it] as if [the jurors] wanted [him] to change [his] vote without any evidence or anything else[,] just because of their peer pressure."

Defense counsel asked Juror 12 if the other jurors pressured him to change his vote. Juror 12 said, "I don't know if anyone said, '[c]hange your vote,' but, yes, that was the pressure . . . . [A]pparently I'm incompetent or something. I don't know. It changed subjects to being about me and not about the case." The trial court then asked if another juror called him incompetent. Juror 12 answered, "[y]es," a juror told him she was, " questioning [his] ability to see this case clearly because of [his] vote." Juror 12 understood the comment as "a judgment on [his] vote."

After Juror 12 left the courtroom, the trial court heard arguments from counsel. The prosecutor argued for Juror 12's removal based on his bias against law enforcement, his use of outside information (the personal notebook), and his failure to deliberate. Defense counsel argued that Juror 12 should not be dismissed since it was not shown that he could not be fair and impartial, that he brought in outside information, or that he refused to deliberate. Defense counsel argued it would be an error to dismiss a juror solely because he is holding his ground against other jurors.

The trial court decided to discharge Juror 12 from the jury. The court explained that its ruling was based "primarily" on the juror's "express[ion] of bias towards law enforcement." The court also noted that Juror 12 (1) failed to disclose during voir dire that his father had been in law enforcement, (2) refused to participate in at least one jury vote, and (3) gave inconsistent answers when questioned by the court.

Later that same day, the reconstituted jury found defendant guilty as charged, after about two and a half hours of deliberations.

B.      *Applicable Law and Standard of Review*

Section 1089 permits the trial court to discharge a juror at any time before or after the final submission of the case if, upon a showing of good cause, the juror is "found to

be unable to perform his or her duty." (See *Perez v. Marshall* (9th Cir. 1997) 119 F.3d 1422, 1426 [upholding section 1089 as facially valid under the Sixth Amendment].) Examples of "good cause" for discharge of an impaneled juror include when the juror (1) exhibits bias or a fixed prejudgment of the issues, (2) refuses to deliberate, or (3) is unable or unwilling to follow the court's instructions. (*People v. Thomas* (1990) 218 Cal.App.3d 1477, 1484-1485; *People v. Cleveland* (2001) 25 Cal.4th 466, 485 (*Cleveland*).)

When a court is put on notice that good cause to discharge a juror may exist, it is the court's duty to make whatever inquiry is reasonably necessary to determine whether the juror should be discharged. (*People v. Cowan* (2010) 50 Cal.4th 401, 505-506.) Although the trial court is afforded discretion in deciding how to conduct such an investigation (*People v. Lomax* (2010) 49 Cal.4th 530, 589), that discretion must be exercised with due caution. (*People v. Fuiava* (2012) 53 Cal.4th 622, 710.) Determining whether to discharge a juror for conduct during deliberations is a "delicate matter." (*Cleveland, supra*, 25 Cal.4th at p. 484.) The trial court must take care not to conduct an investigation that is too cursory, but also must not "intrude too deeply" into the deliberative process to avoid "invading the sanctity of the deliberations or creating a coercive effect on those deliberations." (*Fuiava*, at p. 710.) After having completed an adequate (but not overly-invasive) inquiry, the trial court must then decide whether, under section 1089, there is "good cause" to excuse the juror. (*Fuiava*, at p. 710.)

Even though the decision to retain or discharge a juror is committed to the trial court's discretion, our review of the decision to remove a seated juror is not conducted under the typical abuse of discretion standard, but rather under the "demonstrable reality" test. (*People v. Fuiava, supra*, 53 Cal.4th at p. 711.) The test involves a " 'heightened standard [that] more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury.' " (*People v. Armstrong* (2016) 1 Cal.5th 432, 450 (*Armstrong*).)

Under the demonstrable reality test, our task involves more than simply determining whether there is any substantial evidence upon which a reasonable trier of fact *could* have relied in reaching its conclusion. (*Armstrong*, *supra*, 1 Cal.5th at p. 450.) It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that good cause for disqualification was established. (*Id*. at pp. 450-451.) In applying this test, we will not reweigh the evidence. (*Id*. at p. 451.) But we "must be confident that the trial court's conclusion is *manifestly supported* by evidence on which the court actually relied." (*Ibid*., italics added.) In reaching that conclusion, we must consider not just the evidence itself, but also the record of reasons the court provides. (*Ibid*.; *People v. Jones* (2020) 50 Cal.App.5th 694, 701.)

C.     *Analysis*

The trial court relied on a combination of factors in finding good cause to discharge Juror 12. The "primary" reason for excusing Juror 12 was the court's finding that Juror 12 was biased against law enforcement, as suggested by Juror 12's (1) failure to disclose during jury selection that his late father had been employed as a correctional officer, and (2) his characterization of his father as a "respectful" peace officer, in comparison to other officers who "often aren't respectful." The second reason for excusing Juror 12 was his failure to deliberate, as demonstrated by Juror 12's admission that he refused to participate in one jury vote. Although Juror 12 explained why he refused to participate in the vote—because he felt unjustifiably pressured to change his vote—the court did not find his explanation credible and did not believe he was capable of fulfilling his duties as a juror. The court dismissed the concern that Juror 12 had relied on outside information about the case, but noted that Juror 12 gave inconsistent responses when questioned about whether he had read from his personal notebook. Defendant contends the trial court abused its discretion by failing to conduct an adequate inquiry into the allegations of juror misconduct and by discharging Juror 12 without good cause. We agree with both contentions.

11

### 1.     *Adequacy of the Investigation*

We first address the adequacy of the trial court's inquiry into Juror 12's alleged bias. This issue arose because Juror 12 spontaneously disclosed that his deceased father had been a correctional officer. While investigating whether his father's history raised any concerns about bias—something he denied—Juror 12 disclosed his belief that law enforcement officers often are "disrespectful." The trial court relied on this comment as evidencing a "fairly significant" bias against law enforcement.

Defendant contends that the trial court failed to conduct an adequate inquiry to determine if Juror 12 exhibited impermissible bias against law enforcement. We agree. When a court is put on notice that good cause to discharge a juror may exist, it is the trial court's duty to conduct an inquiry sufficient to determine the facts relevant to the claim of juror misconduct. (*People v. Castorena* (1996) 47 Cal.App.4th 1051, 1066.) That did not occur here, as the court failed to make *any* inquiry into the factual basis for Juror 12's purported bias.

Bias in this context refers to " 'the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party.' " (*People v. Romero* (2017) 14 Cal.App.5th 774, 780, fn. omitted; Code Civ. Proc., § 225, subd. (b)(1)(C).) Thus, " '[w]hat constitutes 'actual bias' of a juror varies according to the circumstances of the case.' " (*In re Manriquez* (2018) 5 Cal.5th 785, 799.) Here, the trial court never investigated the state of mind of Juror 12 to determine whether his perception of police officers as "disrespectful" demonstrated an actual bias that would affect his ability to be fair and impartial in this case. The court never probed what Juror 12 meant when he said that officers "often aren't respectful." The court never asked, for example, whether Juror 12 meant that officers are "rude" and "discourteous," or whether he meant they are disreputable and untrustworthy. Nor did the court explore whether Juror 12 could set aside whatever negative feelings he may have about police

12

officers and decide the case based solely on the evidence and instructions provided by the court. As a result, the court did not have the requisite facts upon which to fairly decide whether Juror's 12's perception of some police officers as "disrespectful" demonstrated an impermissible bias against law enforcement.

We acknowledge that the scope of an investigation is generally a matter for the trial court's discretion. (*People v. Romero, supra*, 14 Cal.App.5th at p. 781.) "Nevertheless, a court abuses its discretion when its ruling 'falls outside the bounds of reason.' " (*Ibid*.) Under the facts of this case, we are persuaded that it was an abuse of discretion for the trial court to discharge Juror 12 for bias without first conducting an inquiry sufficient to determine the relevant facts. (*People v. Castorena, supra*, 47 Cal.App.4th at p. 1066; *Shanks v. Department of Transportation* (2017) 9 Cal.App.5th 543, 556; *People v. Barber* (2002) 102 Cal.App.4th 145, 151-153; *People v. Burgener* (1986) 41 Cal.3d 505, 520-521, overruled on other grounds in *People v. Reyes* (1998) 19 Cal.4th 743, 756.)

2.      *Discharge for Bias*

We also agree with defendant that the trial court abused its discretion by discharging Juror 12 without good cause. While the juror may have expressed an opinion, based on his life experiences, that law enforcement officers "often aren't respectful," such an opinion does not automatically demonstrate that the juror had an actual bias against police officers. All jurors bring their own personal experiences to a case. (*Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 819.) Whether a juror has a *disqualifying* bias frequently turns on whether the juror can set aside any personal feelings or opinions and decide the case based on the evidence and the court's instructions. (See *People v. Henderson* (2022) 78 Cal.App.5th 530, 546 (*Henderson*).)

To illustrate this point, we have previously observed that " '[s]*tanding alone*, [a] belief that the criminal-justice system is systemically unfair to blacks is not a basis to disqualify a juror.' " (*Henderson, supra*, 78 Cal.App.5th at p. 549, fn. omitted.) " '[T]hat

13

belief is neither uncommon nor irrational. Moreover, there is no basis for an inference that potential jurors holding that belief are necessarily unable to be impartial. To the contrary, potential jurors who hold that belief might well be particularly attentive to making sure that they perform their function impartially.' " (*Ibid.*) Similarly, we do not automatically disqualify jurors solely because they have close ties to law enforcement. (See *People v. Woodruff* (2018) 5 Cal.5th 697, 745-746; see also *People v. Wilson* (2008) 44 Cal.4th 758, 785 [a prospective juror's personal objection to the death penalty is not a sufficient basis for excluding that person from jury service in a capital case].)

The facts in this case are unlike those in *People v. Thomas, supra*, 218 Cal.App.3d 1477, in which the court upheld the removal of a juror who announced she could not accept the testimony of officers at trial because of a firm belief, based upon personal experience, that police officers generally lie. (*Id*. at pp. 1482, 1485; accord, *People v. Barnwell* (2007) 41 Cal. 4th 1038, 1049-1051 [upholding removal of a juror who refused to believe the testimony of police officers].) Here, Juror 12's negative perception of police officers concerned their "respectfulness." Further, when asked by the trial court whether he had any concerns about bias toward law enforcement, Juror 12 responded, "I don't think so." When questioned by the prosecutor about his "bias against police officers," Juror 12 clarified that "[perhaps] that's how it sounded," but that he did not "see it as a bias" because he "can look at people and look at the evidence." Neither the prosecutor nor the trial court asked any additional questions related to the purported bias.

In addition, as defendant points out, there was no evidence that Juror 12's purported bias against law enforcement had any impact on his deliberations. Juror 11 raised several complaints about Juror 12's conduct during deliberations, but none of those complaints had anything to do with law enforcement or a perceived bias against the testifying police officers. There were no reports that Juror 12 exhibited hostility to the testifying police officers or that he was unwilling or unable to weigh their testimony with

an open mind. We also find it noteworthy that Juror 12 previously had served on a criminal jury in Tulare County involving "some type of assault on an officer."

The People suggest that we should imply bias based on Juror 12's failure to disclose his deceased father's employment as a correctional officer. However, the record does not support the finding that Juror 12 intentionally withheld material facts during jury selection. (See *People v. San Nicolas* (2004) 34 Cal.4th 614, 644, 646-648 [distinguishing intentional and unintentional concealment]; *In re Manriquez, supra*, 5 Cal.5th at pp. 797-798 [same].) First, the question posed during jury selection—whether jurors have any family or friends "in law enforcement"—was phrased in the present tense and did not ask about *deceased* family or friends. Second, Juror 12 explained that he forgot to mention his father's history during jury selection because it was "many years ago" and that was not how he remembered his father. The trial court made no contrary finding. (See *Henderson, supra*, 78 Cal.App.5th at p. 558 [under a demonstrable reality test, the reviewing court "cannot imply findings the trial court did not expressly make"].) Finally, Juror 12 disclosed his in-laws' connection to law enforcement, showing that he was not trying to avoid the issue.[3] Moreover, the court's finding of bias was not based on the father's undisclosed connection to law enforcement. It was based on the juror's stated belief that, unlike his father, many officers "aren't respectful."

Under the circumstances, the evidence in the record does not show, as a demonstrable reality, that Juror 12 had an actual bias against law enforcement that rendered him unable to reach a fair and unbiased verdict in this case. (Cf. *People v. Thomas, supra*, 218 Cal.App.3d at p. 1484 [cause to dismiss where a juror is unable to

---

[3]    Juror 12 testified that he viewed his father as a "very respectful officer," but that he and his father-in-law did not "get along." This begs the question of what purpose would be served by concealing his father's law enforcement career while disclosing his father-in-law's.

15

cast aside a personal belief that all officers routinely lie]; see also *People v. Bennett* (2009) 45 Cal.4th 577, 621 [bias may not be presumed].)

### 3.     *Discharge for Failure to Deliberate*

The other ground for the trial court's discharge of Juror 12 was a failure to deliberate.  Specifically, the court found that "[Juror 12], by his own admission, at one point during deliberations did not participate in the vote."  Applying the heightened standard of review that governs our review, we cannot say we are "confident that the trial court's conclusion is manifestly supported by [the] evidence on which [it] actually relied."  (*Armstrong, supra*, 1 Cal.5th at p. 451.)

As our high court explained in *Cleveland, supra*, 25 Cal.4th 466, "[a] refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views.  Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury."  (*Id*. at p. 485.)

On the other hand, it is improper to remove a juror because the juror "does not deliberate well or relies upon faulty logic or analysis."  (*Cleveland, supra*, 25 Cal.4th at p. 485.)  "Similarly, the circumstance that a juror disagrees with [a] majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted . . . is not a ground for discharge.  A juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views."  (*Ibid*.)

We also observe that when there are concerns about whether jurors are participating in deliberations, it is usually appropriate to reinstruct the jurors and permit the jury to continue deliberations before making further inquiries that could intrude upon

the sanctity of deliberations.  (*Cleveland, supra*, 25 Cal.4th at p. 480.)  If reinstruction does not solve the problem, then the court should conduct a reasonable inquiry to determine whether such grounds exist.  (*Ibid*.)  In most instances, a reasonable inquiry requires that the court interview "all of the jurors before deciding whether a [particular] juror is unable or unwilling to deliberate."  *Shanks v. Department of Transportation, supra*, 9 Cal.App.5th at p. 553.)  At a minimum, the court must interview more than the complaining juror(s).  (*Ibid*.; accord, *People v. Barber, supra*, 102 Cal.App.4th at p. 151.)  In addition, while the court may allow counsel to "suggest areas of inquiry or specific questions to be posed by the court[,]" our high court has cautioned that "permitting the attorneys for the parties to question deliberating jurors is fraught with peril and generally should not be permitted."  (*Cleveland*, at p. 485; accord, *Barber*, at pp. 150-151.)

As a preliminary matter, we note that the trial court did not follow any of these procedural guidelines.  Upon being advised of the possibility that Juror 12 was not deliberating, the trial court did not reinstruct the jurors and order them to resume deliberations before starting its inquiry.  The court's inquiry was limited to eliciting testimony from two jurors:  The complaining juror and the alleged problem juror.  The court did not interview any of the other jurors.  And the court permitted the attorneys to question the deliberating jurors.

However, even if we look past the way in which the trial court conducted its investigation, we must conclude that the trial court abused its discretion in discharging Juror 12 because the record does not show, as a demonstrable reality, that Juror 12 was refusing to deliberate.  On the contrary, the record shows that Juror 12 was deliberating, voicing his concerns, and interposing questions about the evidence and the law.  Indeed, one of Juror 11's chief complaints was that Juror 12 kept "inserting his opinion while [the other jurors were] still talking," demonstrating that Juror 12 was actively participating in group discussions.  Juror 12 also was willing to listen to the other jurors' perspectives, albeit with "interruptions."

17

Although Juror 11 was clearly frustrated by Juror 12's methods and personally believed he should be removed, "a trial court should be wary of relying on the *opinions* of jurors, rather than on its own consideration of objective facts." (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 75.) " 'It is difficult enough for a trial court to determine whether a juror actually is refusing to deliberate or instead simply disagrees with the majority view. [Citations.] Drawing this distinction may be even more difficult for jurors who, confident of their own good faith and understanding of the evidence and the court's instructions on the law, mistakenly may believe that those individuals who steadfastly disagree with them are refusing to deliberate or are intentionally disregarding the law.' " (*People v. Barton* (2020) 56 Cal.App.5th 496, 512, quoting *People v. Engelman* (2002) 28 Cal.4th 436, 446.)

Here, Juror 12's views on the evidence and approach to deliberations clearly differed from his colleagues, and this certainly caused friction between him and some of the other jurors. But on this record, we cannot say that he was not functionally deliberating. Rather, this appears to be a situation where the juror was convinced early in the case that there was insufficient evidence of guilt and simply refused to change his view. While Juror 12 may have employed faulty reasoning or failed to adequately explain his position, "[t]he circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute . . . ground for discharge." (*Cleveland, supra*, 25 Cal.4th at pp. 485, 486.) Nor may the court discharge a juror for failing to agree with the majority or for "persisting in expressing doubts about the sufficiency of the evidence in support of the majority view." (*Armstrong, supra*, 1 Cal.5th at pp. 453-454; accord, *People v. Bowers* (2001) 87 Cal.App.4th 722, 734.) Juror 12's refusal to participate in a single straw vote taken early in the deliberations—because he ostensibly felt undue pressure to change his vote—does not itself show a failure to deliberate.

Our dissenting colleague contends that we do not afford sufficient deference to the trial court's ruling. (Dis. opn., *post*, at pp. 2, 4, 9-10.) We respectfully suggest that the

dissenting opinion conflates the substantial evidence standard with the "more stringent" demonstrable reality test. (*Henderson, supra*, 78 Cal.App.5th at p. 557.) As we explained in *Henderson*, "[t]he demonstrable reality test 'requires a "stronger evidentiary showing than mere substantial evidence." ' " (*Ibid*.) " ' "That heightened standard more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury." ' " (*Ibid*.)

We do not reweigh the evidence under either test. (*Henderson, supra*, 78 Cal.App.5th at p. 557.) However, under the substantial evidence test, we review the record in the light most favorable to the judgment and uphold it if there is any evidence upon which a reasonable trial court *could* have relied in reaching its decision. (*Ibid*.) While under the demonstrable reality test, which our dissenting colleague concedes we must apply, we must look to the evidence upon which the trial court *actually relied* as the basis for its decision. (*Ibid*.) The record must establish the basis for the court's decision, and the evidence relied upon must be sufficient to support that ground. (*Ibid*.; accord, *People v. Jones*, *supra*, 50 Cal.App.5th at p. 701.)

Because a reviewing court "cannot imply findings the trial court did not expressly make," (*Henderson, supra*, 78 Cal.App.5th at p. 558) the trial court should "expressly state its reasons for discharging the juror, including demeanor-based reasons and credibility findings." (*Ibid.*) " 'In taking the serious step of removing a . . . juror the court must be mindful of its duty to provide a record that supports its decision by a demonstrable reality.' " (*Ibid*.)

Here, as the People concede in their brief, "[t]he court gave two reasons for dismissing [Juror 12]." The People further observe that the trial court "was not concerned by [Juror 12's] use of the personal notebook." Despite this, the dissent suggests that because the record shows Juror 12 made conflicting statements about the notebook, the trial court "had reason to believe that Juror 12 was not being forthright and was instead being deceitful. . . ." (Dis. opn., *post*, at p. 9.) But the trial court did not

19

discharge Juror 12 for being deceitful or dishonest.  Thus, whether the record *could* support such a finding is irrelevant to our analysis.[4]

In any event, the reasons that the trial court provided for disqualifying Juror 12 were the expression of bias and failure to deliberate.  As discussed, neither ground is supported by the evidence on which the trial court actually relied.

Accordingly, we conclude the trial court abused its discretion in discharging Juror 12.  The error was prejudicial and requires reversal of the judgment.  As the People concede, the record strongly suggests that Juror 12 was the lone holdout juror (or a minority holdout juror) against a guilty verdict.  It is reasonably probable that a result more favorable to the defendant would have been reached if Juror 12 had not been erroneously discharged.  (*People v. Bowers, supra*, 87 Cal.App.4th at p. 735; *Armstrong, supra*, 1 Cal.5th at p. 454; *Cleveland, supra*, 25 Cal.4th at p. 486.)

In light of our conclusion, it is unnecessary to address defendant's other contentions.

---

[4]    The notion that Juror 12 gave conflicting statements about the notebook is not supported, even if we were applying the substantial evidence test.  Juror 12 testified that he brought the notebook so that, if he needed to say something to the other jurors, he could organize his thoughts and keep his words polite.  He denied using the notebook to take notes about the case and denied reading from it aloud to the jury.  But he admitted taking notes and admitted his intent was to "be able to read [his words] and say [them] clearly."  Thus, in finding that Juror 12 gave conflicting answers about the notebook, the trial court erred.  (See Dis. opn., *post*, at p. 9.)

## DISPOSITION

The judgment is reversed.  There is no double jeopardy bar to retrial of the case. (*Armstrong, supra*, 1 Cal.5th at pp. 454, 460.)

_____\\s\\_____,
Krause, J.

I concur:

_____\\s\\_____,
Renner, J.

21

Hull, Acting P. J., Dissenting

I disagree with the majority's opinion for several reasons and I therefore dissent.

After conducting a detailed inquiry into the ability of Juror No. 12 (Juror 12) to serve as a fair and impartial juror in this matter, the trial judge ruled:

"THE COURT: All right. Thank you, counsel.

"At this time, the Court is going to excuse (JUROR NO. 12) from service on the case. And the Court is doing that for the following reasons: He did indicate this morning that he failed to disclose to the Court that his father had previously been employed as a correctional officer. He characterized his father as a respectable peace officer, in juxtaposition to what the Court took his statement to mean most other law enforcement officers, which does, in fact, appear to constitute a bias against law enforcement generally speaking with exception for his view of his own dad. That is fairly significant in the Court's view.

"The Court also noted that (JUROR NO. 12), by his own admission, at one point during deliberations did not participate in the vote. Granted, he indicated that he didn't participate because he felt as though he was being pressured. But based on the presentation I saw and heard from (JUROR NO. 11) and (JUROR NO. 12) this morning, I don't see that there's been any sort of undue physical or emotional pressure applied to (JUROR NO. 12) during deliberations.

"He's made a number of statements to the Court during this questioning period that appear to be in conflict. At one point, he indicated that he didn't feel that the jury was in a position to render a vote at the end of the day on Friday, and then in the next breath he indicated that there was an issue with the way that the vote was taken. He wanted the vote to continue. So I found that to be in conflict.

"As far as the outside notebook goes, I'm not so concerned that it contained any outside information about this case as much as I'm concerned that at one point during the

1

questioning he denied that he had read from it, then subsequently indicated that he had, in fact, read it in an effort to remain respectful of the others on the jury.

"So those are the concerns that the Court has.

"The Court is primarily concerned about the express of bias towards law enforcement. And that's the, that's the [*sic*] primary reason that I'm going to excuse him from service."

The majority concludes "the trial court abused its discretion in discharging Juror 12. The error was prejudicial and requires reversal of the judgment." (Maj. Opn. at p. 20.)

In reaching this conclusion, the majority overlooks much in the judge's order explaining why he decided to dismiss Juror 12, not the least of which is a misreading of the trial court's ruling.

In its ruling the trial court decided to dismiss Juror 12 (1) *primarily* because of express bias against law enforcement officers, (2) because he admitted he didn't participate in one of the jury's votes because he felt "pressured," and (3) Juror 12 made statements during questioning that were in conflict with what he had said earlier in regard to the notebook that he prepared outside of trial.

The majority opinion accurately states most, but not all, of the law that bears on the issue before us. More to that in a moment. Thus, the majority's opinion states:

"Section 1089 permits the trial court to discharge a juror at any time before or after the final submission of the case if, upon a showing of good cause, the juror is 'found to be unable to perform his or her duty.' (See *Perez v. Marshall* (9th Cir. 1997) 119 F.3d 1422, 1426 [upholding section 1089 as facially valid under the Sixth Amendment].) Examples of 'good cause' for discharge of an impaneled juror include when the juror (1) exhibits bias or a fixed prejudgment of the issues, (2) refuses to deliberate, or (3) is unable or unwilling to follow the court's instructions. (*People v. Thomas* (1990)

218 Cal.App.3d 1477, 1484-1485; *People v. Cleveland* (2001) 25 Cal.4th 466, 485 (*Cleveland*).)

"When a court is put on notice that good cause to discharge a juror may exist, it is the court's duty to make whatever inquiry is reasonably necessary to determine whether the juror should be discharged. (*People v. Cowan* (2010) 50 Cal.4th 401, 505-506.) Although the trial court is afforded discretion in deciding how to conduct such an investigation (*People v. Lomax* (2010) 49 Cal.4th 530, 589), that discretion must be exercised with due caution. (*People v. Fuiava* (2012) 53 Cal.4th 622, 710.) Determining whether to discharge a juror for conduct during deliberations is a 'delicate matter.' (*Cleveland, supra*, 25 Cal.4th at p. 484.) The trial court must take care not to conduct an investigation that is too cursory, but also must not 'intrude too deeply' into the deliberative process to avoid 'invading the sanctity of the deliberations or creating a coercive effect on those deliberations.' (*Fuiava,* at p. 710.) After having completed an adequate (but not overly-invasive) inquiry, the trial court must then decide whether, under section 1089, there is 'good cause' to excuse the juror. (*Fuiava*, at p. 710.)

"Even though the decision to retain or discharge a juror is committed to the trial court's discretion, our review of the decision to remove a seated juror is not conducted under the typical abuse of discretion standard, but rather under the 'demonstrable reality' test. (*People v. Fuiava, supra*, 53 Cal.4th at p. 711.) The test involves a ' "heightened standard [that] more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury." ' (*People v. Armstrong* (2016) 1 Cal.5th 432, 450 (*Armstrong*).)

"Under the demonstrable reality test, our task involves more than simply determining whether there is any substantial evidence upon which a reasonable trier of fact *could* have relied in reaching its conclusion. (*Armstrong, supra,* 1 Cal.5th at p. 450.) It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that good cause for disqualification was established.

3

(*Id*. at pp. 450-451.)  In applying this test, we will not reweigh the evidence.  (*Id*. at p. 451.)  But we 'must be confident that the trial court's conclusion is *manifestly supported* by evidence on which the court actually relied.'  (*Ibid*., italics added.)  In reaching that conclusion, we must consider not just the evidence itself, *but also the record of reasons the court provides*.  (*Ibid*.; *People v. Jones* (2020) 50 Cal.App.5th 694, 701.)"  (Maj. Opn at pp. 9-11, last emphasis added.)

The majority opinion concludes that Judge Rodriguez erred when he found, although he did not expressly state, that Juror 12 was unwilling or unable to perform his duties as an unbiased juror.

The trial judge so found because, according to the court, Juror 12 was (1) biased against the testimony of law enforcement officers, (2) that Juror 12 admitted he didn't participate in one of the jury's votes, and (3) because he made conflicting statements regarding the notebook he prepared and brought into the courtroom.  Our duty is to examine the evidence to decide if one or more of those three grounds for decision are adequately supported measured against the demonstrable reality rule.  I find that they were.

Applying the demonstrable reality test "requires a showing that the court as trier of fact *did* rely on evidence that, considering the entire record, supports its conclusion that bias was established.  It is important to make clear that a reviewing court does not *reweigh* the evidence under either [the substantial evidence of the demonstrable reality] test.  Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court relied.

"In reaching that conclusion, the reviewing [court] will consider not just the evidence itself, but also the record of reasons the court provides."  (*People v. Barnwell*, (2007) 41 Cal.4th 1038, 1052-1053 (*Barnwell*).)

4

First as to the trial court's reasons for disqualifying Juror 12 for potential bias against the testimony of law enforcement officers. The trial judge gives us the evidence he relied on in arriving at his decision; that is, that Juror 12 "failed to disclose to the Court that his father had previously been employed as a correctional officer. He characterized his father as a respectable peace officer, in juxtaposition to what the Court took his statement to mean most other law enforcement officers, which does, in fact, appear to constitute a bias against law enforcement generally speaking with exception for his view of his own dad. That is fairly significant in the Court's view."

Given that explanation by the court, we are told what the trial court relied on in reaching its decision thus satisfying the first part of the demonstrable reality test. Substantial evidence in the record supports the trial court's conclusion.

When asked about his views regarding the testimony of law enforcement officers during the court's inquiry into his disqualification, Juror 12 said that, during voir dire, he "did forget to mention" his father was a retired California Department of Corrections and Rehabilitation correctional officer.

Specifically, his testimony on the subject started as follows:

"JUROR #12: . . . And I did forget to mention that my father was a correctional officer. I apologize. It's just not how I see my father. But he was a correctional officer many years ago. He died when I was 18. That's all. If that's --

"THE COURT: Okay. Well, that's an issue that was brought up during jury selection, whether you have any connections to law enforcement. You're stating your dad was a correctional officer before he passed away?

"JUROR #12: Yes. And I just didn't think of that at all, because that's not how I seen him.

"THE COURT: Do you have any concerns that you would have a bias one way or another towards law enforcement because of what your dad used to do for a living?

5

"JUROR #12:  *I don't think so.*  He was a very respectful officer.  And I knew him as a peace officer, correctional officer.  But yeah."  (Emphasis added.)

Upon further inquiry by the District Attorney on the subject of bias against the evidence provided by law enforcement officers, the record of trial relates the following:

"[DISTRICT ATTORNEY]:  Why, why didn't you mention that your father was a correctional officer?  We went through quite a bit of voir dire about that.

"JUROR #12:  It completely slipped my mind.  And I have to say, I honestly recall that I actually wasn't even asked any of the other questions after the fact that the other jurors were asked whether or not I had any religious beliefs and other stuff.  I think we just went on and that was just everyone's mistake, I guess.  But I wasn't trying to hold anything from the Court.

"[DISTRICT ATTORNEY]:  You said that you didn't really see him as a correctional officer, but just now you told us that you knew him as a peace officer.

"JUROR #12:  I was referring to when he became a correctional officer.  I knew him as a peace officer.  Because officers often aren't respectful.  At least -- perhaps, that's my bias.  But I find that a lot of officers use a lot of disrespectful ways of conducting their conduct.  And my father was not of that kind.  He was a peace officer trying to keep the peace.

"[DISTRICT ATTORNEY]:  So --

"JUROR #12:  I apologize, yeah, if that was a bias.

"[DISTRICT ATTORNEY]:  So you just told us you have a bias against police officers.

"JUROR #12:  I suppose that's how it sounded.  That's -- you know -- I don't see it as a bias when I can look at people and look at the evidence.  But I find it definitely to be not as much of a bias as the rest of my peers.  But, yeah, take it how you want."  (Emphasis added.)

6

This testimony, which certainly suggests dissembling regarding his not earlier revealing that his father was a law enforcement officer, gives ample evidentiary support to the trial judge's observation that Juror 12 "characterized his father as a respectable peace officer, *in juxtaposition* to what the Court took his statement to mean most other law enforcement officers, which does, in fact, appear to constitute a bias against law enforcement generally speaking with exception for his view of his own dad."

The majority is prepared to excuse Juror 12's failure to reveal that his father was in law enforcement by hypothesizing that perhaps Juror 12 was just confused. The majority wonders if that confusion could have arisen because, during voir dire, the jury was asked if any juror had family or friends *in* law enforcement as opposed to being asked whether a juror had family or friends *in* law enforcement or who *had been* in law enforcement. (Majority Opn. at pp. 15-16.) I find that hypothesis unlikely.

A potential juror acting in good faith had he been confused about the question would have told the court that his father had been a law enforcement officer but was not presently *in* law enforcement because he was deceased and would have asked the court to clarify the question. Juror 12 did not exhibit any confusion about the question or ask for clarification of that point when providing his answers during voir dire. More importantly, Juror 12 did not later, when questioned on this point by the trial judge, claim semantic confusion, but instead said he "forgot" about the work his father, whom he apparently respected, did.

Significantly, during later questioning on his capacity to serve, he admitted that, in his view, *officers often aren't respectful. At least -- perhaps, that's my bias. But I find that a lot of officers use a lot of disrespectful ways of conducting their conduct.*

The trial court undertook an extensive inquiry into the question of Juror 12's possible bias against evidence presented by law enforcement officers and allowed significant questioning by counsel. The trial judge, in exercising his discretion, did not credit Juror 12's explanation for why Juror 12 did not mention his father's work during

7

voir dire and concluded that his "I forgot" excuse disclosed a biased juror. The trial judge told us what he *did* and why he did it and substantial evidence supports his decision.

The trial judge also decided to disqualify Juror 12 because of his testimony regarding participating in a jury vote during deliberations. Specifically, the court found that Juror 12 "by his own admission, at one point during deliberations did not participate in the vote. Granted, he indicated that he didn't participate because he felt as though he was being pressured. *But based on the presentation I saw and heard* from (JUROR NO. 11) and (JUROR NO. 12) this morning, I don't see that there's been any sort of undue physical or emotional pressure applied to (JUROR NO. 12) during deliberations." (Emphasis added.)

Once again, the trial judge placed what he *did* on the record, that is, he disqualified Juror 12, in part, because he had refused to participate in a vote by the jury which constitutes a failure to deliberate. The substantial evidence in support of that conclusion was that Juror 12 admitted he refused to vote because he felt "pressured" although the trial court, after seeing and hearing Juror 11 and Juror 12, found no evidence that Juror 12 had been pressured on the vote.

Finally, the notebook. The trial judge said he was concerned that Juror 12 prepared a notebook out of court that he brought into jury deliberations because, as Juror 12 said, he wanted to "politely" and "clearly" share his thoughts with the other jurors so that he could "remain respectful of the others on the jury." The court noted that the jurors, as is commonly the case in jury trials, were provided notebooks that they could use during the trial to record what they thought was important and asked why Juror 12 thought he needed a notebook he prepared outside of trial and the jury room. Juror 12 replied: "I only used it, like I said, to try and write down that I felt like I was being barred from having my vote heard."

Commendably, the trial judge declined the offer to review what had been written in Juror 12's personal notebook, no doubt out of concern for intruding into juror

deliberations. But the court based his disqualification order on the fact that Juror 12 had given conflicting answers about use of the notebook, at first saying he had not read from it in the jury deliberation room but later saying he had read it to remain respectful. In this portion of his order, the trial judge was only slightly wrong. I do not find anything in the record that shows that Juror 12 admitted he opened the notebook during jury deliberations, but the record reflects that Juror 11 reported to the court that "He was -- he was reading from them. I don't know if he did actually reference them, but he was reading from them. They were open, and he was looking at them." A full reading of the court's inquiry into Juror 12's ability to serve reflects that the court found Juror 11 credible. In any event, the record shows that Juror 12 gave inconsistent and untruthful answers regarding his use of his personal notebook.

Again, the trial court told us what it did and set out the evidence supporting why he did it. That evidence was substantial.

In short, the court had reason to believe that Juror 12 was not being forthright and was instead being deceitful on each of these points, each of which supported disqualification and each of which was supported by the evidence.

The most baffling shortcoming of the majority's opinion is that it does not give even a nod to, much less discuss, the important role played in this type of analysis of recognizing that the trial judge, as the finder of fact, saw and heard the witnesses. The trial judge's order alluded to his live, in court, observations when he specifically noted that, "having seen and heard" Juror 11 and Juror 12 on the question of other jurors' pressures on Juror 12, he found Juror 12's claim not credible as to that point. The trial judge relied at least in part on what he saw and heard in the courtroom, that is, nonverbal conduct, when questioning and judging the credibility of the two jurors.

In *Barnwell, supra,* 41 Cal.4th 1038, our Supreme Court instructed that, "[t]he evidence bearing on the question whether a juror has exhibited a disqualifying bias during deliberations may be in conflict. Often, the identified juror will deny it and other

9

jurors will testify to examples of how he or she has revealed it. (See, e.g., [*People v.*] *Thomas, supra*, 218 Cal.App.3d 1477, 1482–1485 [bias against police officers].) In such a case the trial court must weigh the credibility of those whose testimony it receives, *taking into account the nuances attendant upon live testimony. The trial court may also draw upon the observations it has made of the jurors during voir dire and the trial itself. Naturally, in such circumstances, we afford deference to the trial court's factual determinations, based, as they are, on firsthand observations unavailable to us on appeal."* (*Barnwell* at p. 1053, emphasis added.)

A seasoned trial judge or a seasoned trial lawyer for that matter, quickly learns how important it is to judge a juror's qualifications to serve as an unbiased juror based not only on his words, but also on his facial expressions, tones of voice and other body language that an appellate court cannot discern from what is only a typewritten record of those words. This same concept underlies the principle that, absent extreme circumstances, an appellate court must accept a jury's factual determinations, largely because the jury saw and heard the witnesses and thus received valuable information and cues from what the jury saw and heard in evaluating a witness's credibility, information the appellate court does not have. The same applies to the trial court in its decision on disqualification of a juror for bias.

The majority has not "tak[en] into account the nuances attendant upon live testimony" and, in that failing, has not afforded "deference to the trial court's factual determinations, based, as they are, on firsthand observations unavailable to us on appeal." (*Barnwell, supra,* 41 Cal.4th at p. 1053.) The majority has found error from afar and without full knowledge of what occurred in the courtroom.

" ' " '[T]he term judicial discretion "implies absence of arbitrary determination, capricious disposition or whimsical thinking." ' [Citation.] '[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered.' " ' (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1450 [].) 'It is

appellant's burden on appeal to establish an abuse of discretion and prejudice.' (*People v. Albarran* (2007) 149 Cal.App.4th 214, 225 [].)" (*People v. Pacheco* (2022) 75 Cal.App.5th 207, 213.)

I find nothing that was "arbitrary or capricious" in the trial court's ruling nor do I find "whimsical" thinking.  The court did not exceed the bounds of reason, all circumstances being considered.

There was no abuse of discretion here even under the demonstrable reality test.  I would affirm the judgment.


　　　　　　　　　　　　　　　\s\
　　　　　　　　　　　　　HULL, Acting P. J.